UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | |
|---|---|
| Dominique Lewis, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 14 CV 50195 |
| | ) Magistrate Judge Iain D. Johnston |
| Carolyn W. Colvin, Acting | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Dominique Lewis brings this action under 42 U.S.C. §405(g), challenging the denial of social security disability benefits.

**INTRODUCTION**

As this Court has previously noted, Social Security Administrative Law Judges (ALJs) are often required to hear cases involving mentally ill drug addicts. *Koelling v. Colvin*, 2015 U.S. Dist. LEXIS 140754, *1-2 (N.D. Ill., Oct. 16, 2015). The ALJs have the difficult task of determining which of these applicants are entitled to benefits and which are not. *Id.* In denying benefits in this case, the ALJ found that the applicant was not credible. Record evidence exists to support that finding. But the ALJ unfortunately failed to engage in an analysis the Seventh Circuit requires when making that credibility determination in a case like this. Consequently, this Court remands the case, but is not finding that the applicant is disabled. *Moore v. Colvin*, 743 F.3d 1118, 1124 (7th Cir. 2014).

## BACKGROUND

On April 15, 2011, when she was only 30 years old, plaintiff applied for supplemental security income, alleging she was disabled based on her bipolar disorder, depression, and learning disability.

By her own account, plaintiff has had a troubled and transient life, which a brief biographical overview demonstrates. She alleges that she was molested as a child by family members; she began drinking alcohol at age 14, the year she first became pregnant; she dropped out of school in the eighth grade; she had six children, by three different men, and has never been married to any of them; all six children were taken from her by the Illinois Department of Children and Family Services (DCFS) because of personality problems and her drug and alcohol addiction; she attempted suicide multiple times; she has served time in jail for several offenses; she has been unable to hold a job; she has been homeless for almost four years; and she has suffered through abusive relationships and lived in women's shelters. *See, e.g.*, R. 334, 340, 353, 358, 552, 554.

After filing her application, plaintiff was evaluated in July 2011 by psychologist Kelly Renzi who diagnosed her with major depressive disorder and borderline personality disorder and rated her GAF as 50. Later that month, a state agency psychologist, Donna Hudspeth, completed the Psychiatric Review Technique (Ex. 7F) and the Mental Residual Functional Capacity Assessment (Ex. 8F). She found that plaintiff had major depressive disorder, borderline personality disorder, and polysubstance dependence. However, she found that plaintiff only had mild limitations in activities of daily living and social functioning and moderate difficulties in maintaining concentration, persistence, or pace.

A hearing before the administrative law judge ("ALJ") was first set for October 25, 2012 in Madison, Wisconsin. Plaintiff's then counsel appeared and told the ALJ that plaintiff had called ten minutes before the hearing to say she would not be appearing. A new hearing was held on February 27, 2013. Plaintiff appeared, although counsel was no longer representing her. She testified that was single and had six children under 18 (ages 17, 15, 13, 12, 8, and 6). She was currently living at a domestic violence shelter in Rockford, where she resided for two weeks. She had last worked clearing tables for about two weeks in September 2012. The job ended because she had trouble getting to the job and got into fights with co-workers. She encountered similar problems in earlier jobs working as a cashier. When asked why she had not sought work since September 2012, plaintiff answered: "I was homeless in a domestic abuse relationship that prevented me from reaching out to family and friends." R. 38.

Plaintiff testified that she generally felt overwhelmed: "I feel a sense of hopelessness. Every time I make an attempt to get my life on the right track or try to do positive things and correct my thinking, I get overwhelmed and I'm used to going back to my old ways because my old ways feel so normal and familiar even knowing the consequences." R. 39. Two of her children were adopted by plaintiff's mother; two others were adopted almost four years ago; and two others were in foster care. She received $200 a month in food stamps and had been homeless for almost four years.

At the domestic violence center where she was then staying, she had to perform one chore every day, which was sweeping and mopping one room. Plaintiff had problems doing this task consistently, even though failure to complete the work placed her at risk for removal from the facility. Plaintiff was taking medications for bipolar disorder and depression, but they caused drowsiness, overeating, dry mouth, and suicidal thoughts. She claimed to have last used alcohol

and a "little bit" of drugs in September 2012. She described the difficulty of getting treatment: "I've been going to meetings. Nobody wanted to take me because every time I try to receive the help for the substance abuse treatment, they'll tell me they can't give me help because I needed mental health treatment and vice versa." R. 43. Plaintiff had personality conflicts with the women at her shelter because, she believed, they were "out to get [her]" and "want[ed] to steal from [her]." R. 43-44. When she was homeless, she "used to work the street" and "get money from strangers." R. 44. At the time she thought this behavior was normal, but is now "clean and going a totally different route to have a positive network." *Id.*

After plaintiff testified, a vocational expert then testified that plaintiff could work various jobs, such as industrial cleaner and sandwich maker. Plaintiff asked no questions to the VE. There were no other witnesses.

On April 16, 2013, the ALJ issued his opinion finding plaintiff not disabled. The ALJ found that plaintiff had the severe impairments of bipolar disorder, major depressive disorder, personality disorder, and polysubstance dependence but found that plaintiff did not meet a Section 12 mental health listing. In evaluating the paragraph B criteria, the ALJ found that plaintiff had mild limitations in activities of daily living. The ALJ relied on function report completed by plaintiff (Ex. 3E) that, according to the ALJ, showed that plaintiff was able "to live independently, attend to personal care tasks, prepare daily meals, count change, utilize public transportation, and shop for three to four hours at a time." R. 14. The ALJ noted that plaintiff's mother also completed a report (Ex. 10E), but the ALJ found it was inconsistent with plaintiff's "ability to seek out and obtain mental health care (even if she was routinely noncompliant with treatment recommendations), seek out and obtain brief part-time employment, and her testimony at the hearing in which she noted that she is required to attend to a number of daily activities in

4

her current living situation at a domestic violence shelter." *Id.* As for social functioning, the ALJ found that plaintiff had "no more than a moderate limitation" because she was able "to socialize daily with others" and "attend medical appointments, AA meetings, and counseling sessions," and because no treating source noted any problems on mental status examinations. R. 15. As for concentration, persistence, or pace (the third criteria), the ALJ found that plaintiff had a moderate limitation because she "engage[d] in goal-oriented activities [] such as seeking out and obtaining health care and securing resources for food and housing assistance." *Id.*

The ALJ found that plaintiff had a residual functional capacity ("RFC") to perform a full range of work but should be limited to "simple, routine, repetitive tasks"; limited to "work involving only occasional changes in the work setting"; limited to "only brief and superficial interaction with coworkers"; and precluded from public interaction. R. 16. The ALJ found that plaintiff lacked credibility because she repeatedly failed to follow through with treatment recommendations, often missing appointments and even showing up for one appointment high on crack; she lied about using alcohol and drugs; and several doctors noted on mental status examinations that she had no problems. The ALJ gave "great weight" to the opinions of the state agency psychologist. The ALJ dismissed several low GAF scores because they were "one-time" assessments that did not consider "functioning over time." R. 19.

## DISCUSSION

A reviewing court may enter judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). If supported by substantial evidence, the Commissioner's factual findings are conclusive. Substantial evidence exists if there is enough evidence that would allow a reasonable mind to determine that the decision's conclusion is supportable. *Richardson v. Perales*, 402 U.S.

5

389, 399-401 (1971). Accordingly, the reviewing court cannot displace the decision by reconsidering facts or evidence, or by making independent credibility determinations. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

However, the Seventh Circuit has emphasized that review is not merely a rubber stamp. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). A reviewing court must conduct a critical review of the evidence before affirming the Commissioner's decision. *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008). Even when adequate record evidence exists to support the Commissioner's decision, the decision will not be affirmed if the Commissioner does not build an accurate and logical bridge from the evidence to the conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). Federal courts cannot build this logical bridge on behalf of the ALJ. *See Mason v. Colvin*, 2014 U.S. Dist. LEXIS 152938, at *19 (N.D. Ill. Oct. 29, 2014).

In her opening brief, plaintiff identified four major arguments, although she included several sub-arguments, as evidenced by the Government's response brief which recasts them into the following six arguments: (1) the ALJ's hypothetical to the Vocational Expert included a limitation on "occasional" interaction with co-workers rather than the actual RFC limitation of "brief and superficial" interaction; (2) the ALJ failed to conscientiously inquire into the bases for the Vocational Expert's conclusions about the number of available jobs in Wisconsin; (3) the ALJ failed to include in the RFC a limitation that plaintiff be limited to one to two step tasks; (4) the ALJ failed to include in the RFC that plaintiff had moderate limitations in concentration, persistence, or pace as well as problems with supervisors; (5) the ALJ failed to consider plaintiff's obesity; and (6) the ALJ erred in the credibility assessment by not inquiring why plaintiff had an inconsistent treatment history. For the most part, these are narrow arguments, focusing on discrete parts of the ALJ's ruling. Several of them address issues on which the

Seventh Circuit has not yet, insofar as this Court can determine, provided definitive guidance. Accordingly, these arguments present close questions in some instances. However, the Court finds that the sixth argument listed above provides a clear basis for ordering a remand, and the Court therefore begins with it. This argument also implicates a larger question about plaintiff's drug and alcohol problems.

In this sixth argument, plaintiff asserts that although the ALJ found that she lacked credibility because she failed to consistently seek and follow through on treatment recommendations, the ALJ did not inquire into possible explanations for these failures—in particular, "the very real possibility that her multiple mental impairments prevent[ed] her from complying." Dkt. #32 at 13. This argument relies on the well-established rule, set forth both in Social Security regulations and Seventh Circuit cases, that an ALJ has a duty to first ask a claimant about, and explore a claimant's explanations regarding, treatment inconsistencies before drawing any negative adverse inferences from them. *See* SSR 96-7p;[1] *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008).

The case law refers to several possible mitigating explanations for inconsistent treatment, a common one being practical and financial difficulties.[2] Although not explicitly mentioned in plaintiff's brief, this explanation potentially applies here. Another barrier, one plaintiff did raise, is her mental health problems. This issue was discussed most prominently in *Kangail v. Barnhart*, 454 F.3d 627 (7th Cir. 2006), where, as here, the claimant suffered from bipolar

---

[1] After the briefs were filed, SSR 96-7p was replaced by SSR 16-3p, but it still contains the same general principles applicable to this duty of inquiry.
[2] *See, e.g., Pierce v. Colvin*, 739 F.3d 1046, 1050 (7th Cir. 2014) (an ALJ cannot "rely on an uninsured claimant's sparse treatment history to show that a condition was not serious without exploring why the treatment history was thin"); *Craft*, 539 F.3d at 679 (ALJ failed to consider that "a number of medical records reflected that Craft had reported an inability to pay for regular treatment and medicine").

disorder and had problems complying with doctor recommendations.[3] The Seventh Circuit offered several observations about bipolar disorder. One was that it is often difficult for these individuals to comply with treatment recommendations:

> [I]t is true that bipolar disorder is treatable by drugs. But mental illness in general and bipolar disorder in particular (in part because it may require a complex drug regimen to deal with both the manic and the depressive phases of the disease) may prevent the sufferer from taking her prescribed medicines or otherwise submitting to treatment. The administrative law judge did not consider this possibility.

---

[3] The Commissioner and this Court are bound by the Seventh Circuit's 2006 opinion in *Kangail*. But the Court notes its concern that certain assertions about the complicated relationship between bipolar disorder and alcoholism and other drug dependency disorders made in *Kangail* may be somewhat simplified and overstated and not fully consistent with the medical literature *sua sponte* cited in that opinion. The *Kangail* court was correct that the literature existing at the time found a relationship between bipolar disorder and substance abuse. Salloum, *The Impact of Substance Abuse on the Course and Treatment of Bipolar Disorder*, 2 Bipolar Disorders 269 (2000) ("The association between alcohol and other psychoactive substance misuse and manic-depressive illness has been long known."); Sonne & Brady, *Bipolar Disorder and Alcoholism*, National Institute on Alcohol Abuse and Alcoholism, November 2002 found at http://pubs.niaaa.nih.gov/publications/arh26-2/103-108.htm. More recent studies have confirmed that relationship. Swann, *The Strong Relationship Between Bipolar and Substance –Use Disorder*, Annals of the New York Academy of Sciences 276 (2010). But even in 2006, the medical literature cautioned that "[t]he nature of the relationship between alcoholism and bipolar disorder is complex and not well understood." Sonne & Brady, *Bipolar Disorder and Alcoholism*, National Institute on Alcohol Abuse and Alcoholism, November 2002. The medical literature identified hypotheses for the co-occurrence: (1) substance abuse occurs as a symptom of bipolar disorder; (2) substance abuse is an attempt to self-medicate symptoms – the proposition espoused in *Kangail*; (3) substance abuse causes bipolar disorder – the proposition that *Kangail* appears to reject; and (4) substance abuse and bipolar disorder share a common risk factor. Bizzarri, et al., *The Spectrum of Substance Abuse in Bipolar Disorder: Reasons for Use, Sensation Seeking and Substance Sensitivity* 9 Bipolar Disorders 213 (2007). But the medical literature found that none of these hypotheses individually explained all cases of comorbidity between bipolar disorder and substance abuse. *Id; see also* Swann, *The Strong Relationship Between Bipolar and Substance –Use Disorder*, Annals of the New York Academy of Sciences 276 (2010) ("Substance abuse may trigger or predispose to bipolar disorder, bipolar disorder may predisposed to substance abuse, perhaps through self-treatment or through increased sensitivity to rewarding stimuli, or both disorders could arise from a common mechanism."). According to medical studies, the relationship between bipolar disorder and substance abuse makes not only the treatment but also the diagnosis of both disorders difficult. Indeed, at least one author suggests that bipolar disorder may be overdiagnosed in patients with substance abuse. El-Mallakh, *Is Bipolar Disorder Overdiagnosed Among Patients with Substance Abuse?*, 9 Bipolar Disorders 646 (2007). Moreover it is important to remember that ALJs, counsel and courts must not play doctor. *Browning v. Colvin*, 766 F.3d 702, 706 (7th Cir. 2014) (ALJ must not play doctor); *Lopez v. Astrue*, 807 F. Supp. 2d 750, 763 (N.D. Ill. 2011) (claimant's counsel must not play doctor); *Swagger v. Colvin*, 2015 U.S. Dist. LEXIS 151502, *17 (N.D. Ill. Nov. 4, 2015) (Commissioner's counsel and court must not play doctor); *Mitchell v. Colvin*, 2015 U.S. Dist. LEXIS 118937, *11 n. 2 (N.D. Ill. Sept. 8, 2015) (court must not play doctor). All involved should be extra vigilant to resist the temptation to play doctor, especially when dealing with subtle and complex medical issues such as determining the causal relationship of bipolar disorder and substance abuse.

*Id.* at 630 (citations omitted). This point has been echoed in subsequent Seventh Circuit cases. *See Jelinek v. Astrue*, 662 F.3d 805, 814 (7th Cir. 2011) ("ALJs assessing claimants with bipolar disorder must consider possible alternative explanations before concluding that non-compliance with medication supports an adverse credibility inference."); *Spiva v. Astrue*, 628 F.3d 346, 351 (7th Cir. 2010) ("The administrative law judge's reference to Spiva's failing to take his medications ignores one of the most serious problems in the treatment of mental illness—the difficulty of keeping patients on their medications.").

In its response brief, the Government does not dispute these legal authorities, nor that there is a general duty of inquiry. Instead, the Government argues that the ALJ complied with this duty. *See* Dkt. #41 at 15 (the ALJ "inquired about Plaintiff's treatment and the effectiveness of her medication"). The Government points to three pages in the hearing transcript to support this assertion. *See* R. 41-43. However, after reviewing these three pages, as well as the entire transcript, the Court can find no evidence to support this claim. In the three pages, the ALJ asked a few follow-up questions about plaintiff's recent attempts to schedule a doctor appointment (just a few weeks before the hearing) and about her recent effort to re-start counseling. But no effort was made to delve into *why* plaintiff was then having problems. Nor was there any attempt to ask plaintiff about the many earlier treatment failures and missed appointments going back several years, facts later featured prominently in the ALJ's opinion. The Court agrees with plaintiff's assessment: "Merely asking a claimant general questions about her treatment without further inquiring into the reasons behind any issues with treatment does not constitute an actual inquiry into sporadic care or noncompliance such that these could rationally be the basis of a negative credibility finding." Dkt. #42 at 9-10.

It is not as if plaintiff's mental health problems were ambiguous or hidden. As summarized above, both her testimony and the written record showed that she had difficulty finding a stable home, difficulty getting away from an abusive boyfriend, difficulty staying off drugs, and even difficulty doing one chore to stay in a women's shelter. In her Function Report, a document the ALJ relied on for other points, plaintiff stated: "I need motivation and encouragement to take the meds [and] because [I] don't believe they will make me feel better." R. 234. The ALJ did not mention many of these facts in the opinion. It is true that the ALJ generally acknowledged plaintiff's problems, stating that she has "a longstanding history of mental illness," but the ALJ did not go on to consider whether these problems provided a possible explanation for her erratic treatment history. The ALJ also accepted that plaintiff had the severe impairments of bipolar disorder and personality disorder, but never asked whether these particular disorders made it harder to comply with medication recommendations. Moreover, as plaintiff points out in her briefs, at the hearing, she was proceeding *pro se* and therefore may not have understood the importance of volunteering an explanation for the inconsistent treatment. In light of these factors, the ALJ should have taken a more active role in eliciting this testimony and then considering these possibilities, as required by *Kangail*, *Jelinek*, and related cases. The ALJ's failure was not a minor issue. The ALJ chose to make the "inconsistent treatment" rationale a major plank in his decision. He called it a "significant" factor and mentioned it often.[4]

---

[4] *See* R. 17 ("the claimant inconsistently participated in recommended mental counseling"); R. 17 ("her lack of compliance with treatment continued"); R. 18 ("After a year absence, the claimant returned for an appointment with her treating physician to obtain prescribed medications in June 2012."); R. 18 ("she was noncompliant with prescribed medications"); R. 18 ("it was still noted that she was noncompliant with medications"); R. 18 ("continued noncompliance"); R. 18 ("treatment notes reflect that she has never been compliant with such medications for a long enough period to experience any beneficial effects"); R. 18 ("routine failures to take medications"); R. 18 ("her significant pattern of noncompliance").

Another aspect of bipolar disorder, also discussed in *Kangail*, is that symptoms may wax and wane. For this reason, the Seventh Circuit has held that it is not a contradiction to find that a claimant has a severe and disabling mental illness and yet "was behaving pretty normally during her office visits." *Kangail*, 454 F.3d at 629. This is because "bipolar is episodic." *Id.* The ALJ's opinion did not consider this possibility when he placed weight on the fact that plaintiff had no remarkable findings during several mental status examinations. Like the inconsistent treatment rationale, this point was mentioned often in the opinion.[5] But this rationale, according to the Seventh Circuit, overlooks the episodic nature of bipolar illness. Although the ALJ never made clear the exact number of these mental status examinations, it appears that there were only a few, a conclusion consistent with the finding that plaintiff saw doctors infrequently. Along this line, the Court notes that the ALJ disregarded plaintiff's low GAF scores by declaring them to be merely "one-time" assessments. But this seems to be cherry-picking: If the GAF scores were unreliable anecdotal snapshots, then this same criticism would apply to the mental status examinations.

A related but broader issue, one never squarely addressed by the ALJ, is the possible relationship between plaintiff's bipolar disorder and her drug use. This issue was also addressed in *Kangail*. As explained there, the Social Security Act provides that "[a]n individual shall not be considered to be disabled for purposes of this subchapter if alcoholism or drug addiction would . . . be a contributing factor material to the Commissioner's determination that the individual is

---

[5] *See* R. 14 ("no treating or examining source has documented any mental status exam findings of significance"); R. 17 ("Upon mental status examination, she displayed a depressed mood but demonstrated full orientation, appropriate and sustained attention, normal speech, logical and coherent thought process, and intact memory"); R. 17 ("Upon mental status examination, the claimant demonstrated depressed mood as well as below average concentration and memory. Nonetheless, she displayed logical and coherent thought process and no difficulty in following instructions"); R. 18 (noting that plaintiff had "generally unremarkable mental status exam findings even during periods of noncompliance"); R. 19 ("Despite [continued substance abuse and noncompliance with treatment], mental status examinations remained generally remarkable").

disabled." 42 U.S.C. § 423(d)(2)(C). Therefore, "[w]hen an applicant for disability benefits both has a potentially disabling illness and is a substance abuser, the issue for the administrative law judge is whether, were the applicant not a substance abuser, she would still be disabled." *Kangail*, 454 F.3d at 628. The Seventh Circuit in *Kangail* further *sua sponte* observed that some scientific literature supports the proposition that "bipolar disorder can precipitate substance abuse, for example as a means by which the sufferer tries to alleviate her symptoms." *Id.* at 629. Here, as in *Kangail*, the ALJ did not fully explore these questions. It is true that the ALJ repeatedly referred to plaintiff's alcohol and drug problems. *See, e.g.*, R. 16 ("the record reflects a longstanding history of alcohol and cocaine abuse").[6] These references show that the ALJ placed significant weight on the drug use, but the ALJ never clarified how much weight, nor addressed the key questions from *Kangail*, such as whether the bipolar disorder caused the drug problems as a form of self-medication or whether plaintiff would still have the same problems even if she were not using drugs. The ALJ should address these issues more explicitly on remand, and should consider calling an expert to assist in the inquiry.

Having found that the sixth argument requires a remand, the Court will not consider plaintiff's remaining arguments, especially given that some of them involve close questions turning on fact issues not fully developed. For example, plaintiff has argued that the ALJ failed to discuss her obesity. Although true, there does not appear to be much evidence on this issue. For other arguments, the Government concedes that there were errors but argues that they were "minor" based on "subtle differences in language" and were therefore harmless errors. Rather than attempt to parse these issues now based on an incomplete record, it is better to let the ALJ address them in the first instance on remand. It is hoped that plaintiff's current counsel will

---

[6] *See also* R. 13, 14, 16 (two times), 17 (three times), 18 (three times).

continue to represent her to assist in presenting these arguments so that the ALJ can properly address them.

## CONCLUSION

For these reasons, plaintiff's motion for summary judgment is granted, the government's motion is denied, and the case is remanded to the Commissioner for further proceedings consistent with this opinion.

Date: August 30, 2016   By: _____
Iain D. Johnston
United States Magistrate Judge